IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ex. rel. Glenn A. McCandliss, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 03 C 807 |
| ) | |
| BATUR C. SEKENDUR and ORAL SEKENDUR ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM OPINION AND ORDER REGARDING
Parties' Motions for Summary Judgment

JAMES F. HOLDERMAN, Chief Judge:

Relator Glen McCandliss ("McCandliss") filed a qui tam lawsuit on behalf of the United States government against Batur and Oral Sekendur under the False Claims Act ("FCA"), 31 U.S.C. § 3729, alleging that Batur Sekendur ("Batur") filed false claims for disability benefits with the Social Security Administration ("SSA") and Oral Sekendur ("Oral") conspired with him. Before this court is McCandliss's and Batur's cross-motions for summary judgment.[1] (Dkt. Nos. 98 & 134.) For the reasons stated below, the court denies both motions.

BACKGROUND

A.    Application for Social Security Benefits

On February 20, 1992, Batur filed what appears to be his second application for disability benefits with the SSA ("1992 SSA Application"), asserting disability since May 7, 1991 based

---

[1]Oral has been barred from filing any response by a Seventh Circuit order in an unrelated matter requiring him to pay $2,500 to the Seventh Circuit Clerk's Office before this court may accept filings from him in all matters except criminal cases and habeas corpus relief.

1

on symptoms of "chronic neck sprain, fibromyositis, depression, migraine, headaches, allergies, chronic fatigue."[2] (Pl. Ex. 1 at 1.) In the 1992 SSA Application, Batur claimed that he had practiced dentistry before the onset of his disability "until [his] condition worsened" and he "could not perform any work in [his] office." (*Id*. at 1.) Batur stated in the 1992 SSA Application that his symptoms were now "just about constant" and he also complained of memory loss, loss of concentration, and an inability to make decisions. (*Id*. at 1, 6.) Batur signed and dated the 1992 SSA Application under language in the form stating "Knowing that anyone making a false statement or representation of a material fact for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal law, I certify that the above statements are true." (*Id.* at 6.)

In the section of the 1992 SSA Application regarding treatment and medical records, Batur set out a long medical history of treatment. Batur identified by name two doctors that he had seen for treatment, Dr. Dietrich K. Klinghardt and Dr. Michael D. Yablouski, and stated the list of other doctors and reports could be obtained from Dr. Yablouski but were "too many to list." (Pl. Ex. 1 at 2.) Batur also attached business cards for an allergist and physical therapist. (*Id*. at 3.) Batur's treatments included trigger point injections for pain, intravenous treatments of Vitamin C, sensitivity testing for allergies, anti-depressants, anti-inflammatory medications, physical therapy, and referrals to a neurologist, orthopedic surgeon, psychiatrist, and allergist. (*Id*. at 2.) .

---

[2]Batur attached an affidavit from Dr. Guy Anthony Rowley, who after examining Batur's medical records but not conducting a physical examination of Batur, opined that Batur suffers from fibromyalgia. (Def. Ex. A.). Batur refers to his condition throughout the proceedings as fibromyalgia, but it does not appear that Batur ever provided the SSA with that diagnosis.

There is no evidence in the record suggesting that the SSA denied Batur's 1992 SSA Application, however, the court assumes the claim was denied because on August 2, 1992, Batur submitted to the SSA a Reconsideration Disability Report ("1992 Reconsideration Report"). (Pl. Ex. 2.) In the 1992 Reconsideration Report, Batur asserted that his symptoms had worsened, claiming that the pain in his neck and his headaches were "almost constant" and required "constant medication" and that his fatigue and depression had become severe. (*Id*. at 1.) As a result, Batur stated that he had "trouble doing almost anything." (*Id*. at 1.) With regard to the effect on his daily activities, Batur explained in the 1992 Reconsideration Report that he does less driving, can no longer study, reads very little, and stopped doing all work around the house. (*Id*. at 3.) Batur certified that the statements in the 1992 Reconsideration Report were true with his signature. (*Id*. at 4.)

Batur next filed a form entitled "Claimant's Statement When Request for Hearing is Filed and the Issue is Disability," ("1993 Statement"), which he signed and dated "February 29, 1993," although the court notes that "February 29, 1993" does not exist. (Pl. Ex. 3). In the 1993 Statement, Batur noted that the pain and frequency of the migraines had increased and required constant medication. (*Id.* at 1.) Batur listed for his prescribed medications as 30 mg of Vicoden, 700 mg of Soma, 20 mg of Flexeril, 60 mg of Seldane, 20 mg of Prozac, in addition to Chinese pain medications. (*Id*. at 2.) In addition, Batur explained that the headaches and pain are unpredictable "which makes it very hard to do anything with regularity." (*Id.* at 1.) Batur certified to the truth of the 1993 Statement with his signature and date. (*Id*. at 2.)

Although there again is no denial of Batur's claim for disability in the record, the court infers that Batur's claim was denied based on a Batur's submission of a form on March 8, 1993

3

requesting a hearing before an Administrative Law Judge ("ALJ"), ("1993 Request"). (Pl. Ex. 4.) In the 1993 Request, Batur stated that he disagreed with the determination made on his claim because "The conclusion that my pain and depression is occasional and [sic] controled by medication is grossly inaccurate. If medication was effective my condition would not be getting progressively worse." (*Id.* at 1.)

After a hearing held on May 19, 1994, an ALJ granted Batur's claim for disability in a written decision on October 26, 1994. (Pl. Ex. 5.) Batur and his brother Oral both testified at the hearing. The ALJ summarized Oral's testimony in one sentence: "[Batur's] brother testified at the hearing that the claimant's mental and physical condition has greatly diminished because of unrelenting pain." (*Id*. at 2.) The ALJ found Batur's impairments of somatoform disorder, cervical sprain syndrome, migraine headaches, chronic fatigue, and neck and muscle pain to be severe. (*Id*. at 3). The ALJ further found that Batur's impairments met the listed impairment for somatoform disorders, *see* 20 C.F.R. Pt. 404, App. 1 to Sbpt. P § 12.07 (defining somatoform disorders as "Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms."). (*Id.*) The ALJ determined that Batur had been disabled under the Social Security Act since May 7, 1991 and awarded Batur disability benefits. (*Id.*)

B.  Federal Aviation Administration ("FAA") Certificates and Illinois Dental License

During the same time period of the alleged onset of Batur's disability and his submissions to the SSA to obtain disability benefits, Batur applied to the FAA for his First Class Medical Certification for his Student Pilot Certificate on October 17, 1991 ("1991 FAA Certificate") and later his Third Class Medical Certification on December 27, 1993 ("1993 FAA Certificate") by filling out FAA Form 8500-9. (Pl. Exs. 7 & 8.) Batur with his signature on both

4

the 1991 and the 1993 FAA Certificates certified that "all statements and answers provided by me on this application are complete and true to the best of my knowledge" under penalty of 18 U.S.C. §§ 1001; 3571. (Pl. Exs. 7 &8.) In both FAA Certificates, Batur stated that he did not "ever" have or "have now" any of the listed impairments or conditions on the form, including frequent or severe headaches, hay fever or allergy, mental disorders of any sort such as anxiety or depression, "admission to hospital," or other illness, disability, or surgery. (Pl. Exs. 7 & 8.) Batur also checked that he did not currently use any prescription or nonprescription medication. (Pl. Exs. 7 & 8.)

For the FAA Certificates, Batur had to undergo a physical in 1991 with FAA examiner, Dr. Surendra P. Goel, and in 1993 with FAA examiner, Dr. Walter J. Levy, respectively. Both doctors found Batur to have no disabling condition based on an examination and review of the medical history supplied by Batur. (Pl. Ex. 9.) When asked on the 1991 FAA Certificate whether he had visited a health professional in the last three years, Batur did not disclose any visits, and in his 1993 FAA Certificate, he only disclosed the visit to Dr. Goel for his FAA physical in 1991. (Pl. Exs. 7 & 8.)

The FAA also asked on the FAA Certificate about the amount of hours an applicant has flown. Batur attested on the 1991 FAA Certificate that he had logged 20 hours of pilot time total, all of which were within 6 months of his October 17, 1991 application to the FAA. (Pl. Ex. 8.) By his 1993 FAA Certificate, Batur stated that he had logged an additional 40 hours, bringing his total pilot time to 60 hours, with 1.5 hours occurring in the prior six months to December 1993. (Pl. Ex. 7.) Although Batur had flown 60 hours during 1991 to 1993, Batur did not list flying planes as an activity in which he participated in the 1992 SSA Application under

5

the section asking specifically about the claimant's activities, or any of his later filings with the SSA, including his 1992 Reconsideration Request, which asked Batur for information about any change to his daily activities. In an affidavit for this litigation, Batur attested that he took flying lessons until he "concluded after about two years that flying had become unpleasant because the cabins on the small planes in which I was receiving flying instruction became depressurized with altitude changes, which brought on neck pain. (Def. Ex. B. at 2.)

Batur also submitted an application on December 10, 1992 to the Illinois Department of Professional Regulation ("IDPR") to renew his license to practice dentistry in Illinois ("1992 IDPR Application"). (Pl. Ex. 6.) In the 1992 IDPR Application, Batur stated under penalty of perjury that he did not have any disease or condition that would interfere with his ability to practice dentistry.[3] (Pl. Ex. 6.) At a deposition regarding an unrelated private disability claim, Batur testified that when he filled out the 1992 IDPR Application, he did not disclose any medical condition for fear that the IDPR "would not give me a license and I wouldn't be able to go back to work." (Pl. Reply Ex. 6 at 834.)

C.  Batur's Work Activity Follow 1994 Receipt of Disability Benefits

According to Batur, Batur moved to Illinois from New Jersey around 1992 or 1993 and submitted the 1992 IDPR Application, planning to work with his brother Oral in the denture business until the onset of his disability forced him to give up dentistry. (Pl. Reply Ex. 6 at 834, 837, 859.) In September 1994, while Batur's claim for disability was near to being granted, Batur's brother Oral opened One Visit Dental Center, which offered patients crowns and

---

[3]Batur additionally signed on September 3, 1996 and again on June 21, 2000, his New Jersey Driver's License and motorcycle endorsement renewal application, certifying that he does not suffer from any mental, physical, or convulsive disorder (Pl. Exs. 20, 21).

inexpensive, quickly-made dentures, using Batur's dental license and listing Batur as the owner.[4] (Pl. Ex. 22, 23; Pl. Prod. of Requested Doc. Ex. 1 at 6.) The IDPR in May 1998 brought charges against Oral for practicing dentistry without a license and against Batur for aiding and abetting Oral by permitting Oral to use his name and license for One Visit Dental. (Pl. Prod. of Requested Doc. Ex. 2 at 1.) The IDPR later added a charge against Batur, alleging that Batur had a physical illness and/or disability which results in his inability to practice dentistry with reasonable judgment, skill or safety. (*Id.* at 2.) While Oral and a dental technician from One Visit Dental, Krzysztof Balut, testified at the IDPR hearing that Batur was the owner of the One Visit Dental and that Oral was only the office manager, Batur claimed not to know that he was listed as the owner and not to remember signing documents as the owner of One Visit Dental. (Pl. Ex. 13 at 132-42, 162, 207-08; Pl. Ex. 14 at 172; Cmpl. Ex. 6 at 274.) The IDPR eventually settled with Batur in June 1999. (Pl. Prod. of Requested Doc. Ex. 2.) The IDPR suspended Batur's Illinois dental license for a minimum period of 4 months with its restoration dependent on a showing by clear and convincing evidence that he was physically and mentally competent to practice dentistry. (Pl. Prod. of Requested Doc. Ex. 2 at 5-6.) Despite Batur's admission in the settlement agreement that he had a disability preventing him from practicing dentistry with

---

[4]Batur argues that excerpts of testimony before the IDPR and in depositions by Oral Sekendur that have been submitted as evidence in the record are hearsay and cannot be admitted against Batur unless the plaintiff establishes that the statements were made in furtherance of a conspiracy, and, according to Batur, there is insufficient evidence of a conspiracy. *See* Fed. R. Evid. 801(d)(2)(E). Evidence relied upon at summary judgment must be of a type admissible at trial. *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003). Oral's testimony before the IDPR and in various depositions is not hearsay. There is no evidence in the record that Oral will be unavailable to testify at the trial, and at the trial either side may ask Oral about the same topics he discussed in his testimony before the IDPR and in depositions included in the summary judgment record. Therefore, the court may consider Oral's testimony before the IDPR and in various depositions for the truth of the matter asserted.

reasonable judgment, skill or safety, Batur stated that "in the past year [June 1998-June 1999], since he has been taking the new medication Zomig, . . . his physical condition has substantially improved." (Pl. Prod. of Requested Doc. Ex. 2 at 3.)

Batur admits to working occasionally since being awarded disability benefits in 1994. Batur assisted Oral in 1994 about once a week for a total of six months with the practice by treating several patients and giving Oral advice about dental office procedures and supplies. (Pl. Reply Ex. 7.) Batur then appears to have moved from Chicago. (Def. Juris. Ex. 1 at 3.) Following that period, Batur provided dental services to patients at One Visit Dental on approximately two occasions when he was visiting Chicago. (Def. Juris. Ex. 1 at 3-4.) When Batur performed work for One Visit Dental, he was paid wages rather than from a share of the profits. (Pl. Prod. of Requested Doc. Ex. 3 at 273.) On occasion, Batur would deposit his disability checks from the SSA in the checking account for One Visit Dental, for which he was a signatory, and write a check to himself in the exact amount of the deposited disability checks. (Pl. Interrog. No. 8.) Additionally, Batur worked as a office manager in Florida with a Dr. Paul Cavalluzzo in 1996 and 1997, with a Dr. Ashok Lalli of Washington for 4.5 days in 2005 as an independent contractor, and with a Dr. Hilal Ahmad of Washington for three days a week as an independent contractor in February 2006. (Pl. Interrog. No. 24; Pl. Reply Ex. 1 at 6.) In addition, Batur worked a total of 5.5 days as a independent contractor in 2004. In July 2006, Batur planned to open his own office, but it is not clear from the record whether he has succeeded. (Pl. Reply Ex. 1 at 6.)

From the record it appears that Batur updated the SSA on three or four occasions with regard to his disability and some of his employment experiences: in his April 18, 1998 "Report

8

of Continuing Disability Interview," (Def. Juris. Ex. 6 at 3-12), in 2001 in response to an SSA investigation regarding Oral's use of Batur's dental license, in 2005 in an undocumented conversation with an SSA agent, and in a letter to the Seattle Division of Disability dated May 6, 2006 (Pl. Reply Ex. 1). Turning first to Batur's 1998 Report to the SSA ("1998 Report"), Batur asserted that his "condition has gotten worse," and stated that he had been hospitalized and had undergone neck surgery. (Def. Juris. Ex. 6 at 3, 5.) The medications that Batur took had changed since the 1992 Application and now consisted of: Percocet, Oxycontin, Valium, Neurontin, and Zomig—the medication he had credited a year later with improving his physical condition in the settlement agreement with the IDPR. (Def. Juris. Ex. 6 at 9.) Batur also stated that he had "tried several times to return to work in my own profession (Dentistry) but could not due to pain, lack of concentration, and memory loss." (Def. Juris. Ex. 6 at 8.) Batur provided the SSA his attempts to work, identifying his job as the office manager from Dr. Cavalluzzo in 1996 and 1997 and the several occasions in which he tried to work as a dentist during 1992 to 1995.[5] (Def. Juris. Ex. 6 at 7.) Batur did not include any other descriptive information such as location regarding his work as a dentist during 1992-1995, however, the record suggests that this time period coincides with the work he did at One Visit Dental in Chicago. (Def. Juris. Ex. 6 at 7.) After reviewing Batur's 1998 Report, the SSA found his disability to be continuing and his limited work from 1996 to 1997 not to exceed the allowed trial work period under 20 C.F.R. § 404.1574. (Def. Juris. Ex. 6 at 1.)

---

[5]Plaintiff has submitted a 1997 IRS Form 1099-Misc in Batur's name but with the wrong social security number, indicating that Delta Dental Plan of Illinois paid Batur $847 in nonemployee compensation. (Pl. Ex. 16.) Batur disputes ever using a different social security number, performing work for Delta Dental Plan of Illinois, or receiving $847 in compensation. (Def. Ex. B at 4.)

9

The SSA next contacted Batur in November 2001 after receiving a report that Batur was running a dental office in Chicago with his brother. (Pl. Ex. 22.) In response to the SSA agent's question about whether Batur had worked since he had been on disability, Batur stated that he had worked for a dentist in Gainesville Florida in 1996 and 1997. (*Id*.) The SSA agent noted that this work activity had been documented in Batur's file. (*Id*.) When the SSA agent asked whether he had performed any other work, Batur responded "no." (*Id.*) The SSA agent specifically asked if Batur had ever worked in Chicago and Batur stated that he had not worked in Chicago, but his brother had used Batur's dental license to open a dental business illegally. (*Id*.) The SSA agent concluded without further investigation that there was no concealed work activity and thus no overpayment issue. (*Id*.)

On May 6, 2006, in the midst of this litigation, Batur sent a letter to the SSA in Seattle, ("2006 Letter"), informing the SSA that his condition had recently improved and attaching an undated "Work Activity Report" with no stamped date of receipt by the SSA. (Pl. Reply Ex. 1.) Batur explained that he had tried to contact the Social Security Office "numerous times by phone but have been unable to reach anyone" and that he left several messages without response. (*Id.*) Batur asked that the SSA look into the "discontinuation of my payments and the return of any overpayment (if any)." (*Id.*) In the 2006 Letter, Batur told the SSA that his "health has improved due to a new medication (Cymbalta), which I have been taking for about a year now." (*Id*.) Batur also references having talked to a SSA agent in 2005, having given her copies of several paychecks, and having informed her of his intent to return to work more regularly, although there is no other evidence in the record regarding the 2005 contact with the SSA. (*Id*.) In the undated "Work Activity Sheet," which appears to have been attached to the 2006 Letter,

Batur informed the SSA about the 5.5 days he worked in 2004, the 4.5 days he worked for Dr. Lalli in 2005, and his contract job with Dr. Ahmad in 2006. (*Id*. at 3-6.) Even though the SSA calculates earnings from employment based on gross income, *see* 20 C.F.R. § 404.1574(b)(1), Batur does not provide his income for 2005 and 2006 in the Work Activity Report, stating that he does "not anticipate any net income for 2005 or 2006 and may even have a loss. (*Id*. at 7.)

Relator McCandliss, an attorney whom Batur had originally hired to sue his private disability insurer and whom Batur later sued for malpractice, filed this qui tam lawsuit against Batur and Oral in August 2002 under the FCA. The government declined to pursue the lawsuit, and so McCandliss has continued prosecuting the case on his own. After three years on the court's docket, the case has progressed to cross-motions for summary judgment.

## LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, this court takes all facts and inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). In considering a motion for summary judgment, this court is not required to

scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003). Moreover, the evidence relied upon must be competent evidence of a type otherwise admissible at trial. *Stinnett v. Iron Work Gym/Exercise Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002).

For an action under the FCA, the plaintiff must establish that the defendant knowingly made, used, or caused to be made or used a false or fraudulent record or statement in order to get the government to pay money on a false or fraudulent claim. 31 U.S.C. § 3729(a); *see United States ex. rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005); *United States ex. rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999). The mens rea of "knowingly" requires only that the defendant have "actual knowledge of (or deliberately ignore or act in reckless disregard of) the truth or falsity of information presented," not that the defendant have "specific intent to defraud." *United States ex. rel. Durcholz v. FKW, Inc.,* 189 F.3d 542, 544 (7th Cir. 1999). Innocent mistakes or negligence, however, are not actionable. *Lamers*, 168 F.3d at 1018 (quoting *Hindo v. University of Health Servs.*, 65 F.3d 608, 613 (7th Cir. 1995)). The FCA also applies to conspiracies to defraud the government by "getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3).

## ANALYSIS

McCandliss first asserts that Batur knowingly submitted false statements in his claim to the SSA for disability benefits, leading to the award of benefits to Batur in 1994.[6] Based on the

---

[6]To the extent that McCandliss asserts that Batur and Oral did not cooperate in discovery and as a result McCandliss does not have a complete record for summary judgment, McCandliss needed to have filed a motion to compel before this court, or, if he could not respond to Batur's

inconsistencies between Batur's 1992 SSA Application and both his FAA Certificates in 1991 and 1993 and his 1992 IDPR Application regarding his medical condition, McCandliss contends that Batur must not be disabled and therefore must have lied to the SSA in violation of the FCA. Batur provides another perspective on his admitted inconsistencies: according to Batur, the information provided to the FAA and the IDPR was inaccurate, but his statements to the SSA were truthful.

Whether Batur lied to the SSA to receive benefits or lied to the FAA and the IDPR is a crucial distinction under the FCA. Of the three federal and state agencies, only the SSA paid out money on a claim to Batur, and therefore, Batur is liable under the FCA only if he lied to the SSA. *See Gross*, 415 F.3d at 604 (under the FCA "the fraudulent statement's purpose must be to coax a payment of money from the government").

Problematically for both McCandliss's and Batur's cross-motions for summary judgment, whether Batur lied to the SSA in the 1992 SSA Application for benefits or both the FAA in his 1991 and 1993 FAA Certificates and the IDPR in the 1992 IDPR Application is a genuine issue of material fact. Based on the record, the actuality of Batur's disability is disputed. The impairment for which Batur was awarded disability benefits, somatoform, is by definition a disorder for which there are only physical symptoms with no demonstrable organic findings or known physiological mechanisms, as is Batur's later claimed diagnosis of fibromyalgia, (Def. Ex. A.). Hence, should Batur not disclose his symptoms to an examining doctor, the doctor may not be able to diagnose the disorder from medical diagnostic testing. Even Dr. Levy, one of the

---

cross-motion for summary judgment, a motion under Federal Rule of Civil Procedure 56(f). Because McCandliss did not undertake these potential remedies, the court deems his arguments about discovery violations to be waived.

FAA examiners, could at most state when asked at a deposition whether Batur lied to the FAA or lied to the SSA that Dr. Levy thought Batur to be lying to both agencies. (Pl. Ex. 9.) In addition, the record contains two opposing diagnosis based solely on medical records reviewed by doctors—one submitted by McCandliss and one submitted by Batur—regarding Batur's symptoms; neither of which are helpful at the summary judgment stage where the court does not make credibility determinations. (Pl. Ex. 10; Def. Ex. 1.)

Additionally, the court cannot draw the inference that Batur lied to the SSA based on Batur's ability to fly for a total of 60 hours over two years and his omission of this activity from the SSA Application. Although McCandliss claims that Batur would not be able to pilot a plane with his alleged impairments and provides an affidavit from a aviation lawyer in support, (Pl. Ex. 10), Batur attests that it was his worsening disability that forced him to stop flying, which is corroborated by his flying only 1.5 of his 60 hours of flight time in the six months before the filing of his December 1993 FAA Certificate, (Pl. Ex. 7). This evidence when viewed in favor of Batur for the purposes of McCandliss's summary judgment motion demonstrates at most that Batur flew planes until his disability made him unable to fly. With regard to the omission of this activity from Batur's 1992 SSA Application and subsequent submissions to the SSA, first McCandliss never even raises this specific argument in his FCA claim. Furthermore, there is no evidence that Batur knowingly omitted this information from the 1992 SSA Application and subsequent SSA submissions in order to receive benefits from the government, and no evidence that the SSA specifically asked Batur about whether he had submitted an FAA Certificate or applied to the IDPR for a renewed license. Viewing all disputed facts in favor of McCandliss, Batur lied to the SSA, and was truthful to the FAA and the IDPR, but viewing all disputed facts

14

in favor of Batur, Batur was truthful to the SSA, and lied to the FAA and the IDPR.

McCandliss's estoppel argument does not help his case. McCandliss contends that Batur "affirmatively certified an absence of any impairment to multiple governmental agencies, including the Untied States, and he should be estopped from asserting any contrary position in this action." (Pl. Mem. at 13.) "The doctrine of estoppel prevents a litigant from repudiating a representation that has reasonably induced reliance by the person to whom it was made." *DeVito v. Chicago Park Dist.*, 270 F.3d 532, 534-35 (7th Cir. 2001). Estoppel is irrelevant in this context. Batur does not seek to repudiate his attestations to the FAA or the IDPR, rather he concedes in his response brief that those statements were inaccurate. (Def. Mem. at 4-5.) Furthermore, Batur did not make the representation of nonimpairment to the SSA, and so the SSA never relied upon it.

Batur's own argument of collateral estoppel is also inapplicable here. Arguing that the decision by the ALJ in 1994 was a final decision that "must not be questioned in the present forum," (Def. Mem. at 12), Batur ignores 20 C.F.R. § 404.988 which allows a decision by the SSA to be reopened at any time if it was obtained by fraud or similar fault. Furthermore, acceptance of Batur's argument would lead to the absurd situation of preventing the government from prosecuting the fraudulent receipt of disability benefits.

McCandliss argues that Batur, in addition to obtaining benefits in violation of the FCA, concealed from the SSA his employment activity and income subsequent to his award of disability benefits in 1994. Again genuine issues of material fact exist as to whether Batur knowingly with intent to continue to receive benefits failed to report his work activity to the SSA. The record when viewed in the light most favorable to Batur reveals that Batur sufficiently

15

disclosed to the SSA his efforts at working. In his 1998 Report to the SSA, Batur stated he sporadically worked as a dentist from 1992 to 1995 (inferred under summary judgment standards to be at One Visit Dental) and he worked as an office manager during 1996 to 1997. In a conversation with a SSA agent in 2005 and in the 2006 Letter, Batur disclosed his subsequent work activity for the 5.5 days in 2004, the 4.5 days in 2005, and his employment in 2006. As for Batur's statement to an SSA agent during the 2001 investigation that he had never worked in Chicago, under the standards for summary judgment, the court draws the inference that he had reported his sporadic work at One Visit Dental in his 1998 Report to the SSA, and may not have considered these failed attempts and occasional assistance to Oral to be "work" in Chicago. Additionally, the evidence of McCandliss's submission of the IRS form of Delta Dental Plan's payment of $847 to Batur is disputed. The IRS form was offered with no foundation, and Batur denies ever working for Delta Dental Plan and receiving any compensation from the company.

Batur's own motion for summary judgment, however, also cannot succeed on the claim that he concealed his work activity from the SSA. There is still a genuine issue of material fact regarding the specific amount of time that Batur worked at One Visit Dental and income he received, whether he was knowingly the owner of One Visit Dental, and whether he accurately disclosed to the SSA his work activity following his award of disability benefits.

Finally, McCandliss's evidence regarding his claim of conspiracy against Oral and Batur is speculative at this point. First, there is still a genuine issue of material fact with regard to whether Batur is disabled and whether Batur committed a violation under the FCA. If there is no violation, then Oral could not have been involved with Batur in a conspiracy to defraud the SSA. Furthermore, there is no evidence that Oral and Batur shared a general conspiratorial objective to

defraud the SSA. *See Durcholz*, 189 F.3d at 545-546. Oral's testimony at the ALJ is not in the record or adequately summarized aside for the one sentence in the ALJ's 1994 decision. The record also does not establish that Oral's illegal use of Batur's license and acceptance of Batur's occasional assistance at One Visit Dental is related to Batur's claim for disability benefits. Absent from the record is any evidence tying Oral to Batur's receipt of benefits other than Batur's potentially innocent use of One Visit Dental's checking account to cash his disability checks.

## CONCLUSION

Accordingly, the court denies both parties' motions for summary judgment (Dkt Nos. 98 & 134), concluding that genuine issues of material fact exist. The case is set for status on both the plaintiff's claims and defendant Oral Sekendur's counterclaim at 9:00 a.m. on September 26, 2006, at which time further dates will be set.

ENTER:

*James F. Holderman*
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: September 12, 2006