IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex. rel. Glenn A. McCandliss, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 C 807 |
| | ) | |
| BATUR C. SEKENDUR and ORAL SEKENDUR | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION FOLLOWING BENCH TRIAL

JAMES F. HOLDERMAN, Chief Judge:

Relator Glen McCandliss ("McCandliss") filed a qui tam lawsuit on behalf of the United

States government against Batur and Oral Sekendur under the False Claims Act ("FCA"), 31

U.S.C. § 3729, alleging that Batur Sekendur ("Batur") filed false claims for disability benefits

with the Social Security Administration ("SSA") and Oral Sekendur ("Oral")[1] conspired with

him.  After the completion of the parties' pretrial discovery and the filing of the pretrial order,

the court conducted a multi-day bench trial, at which plaintiff McCandliss and defendant Batur

Sekendur presented testimony and other evidence.  After reviewing that evidence and

---

[1]Oral has been barred from filing any response by a Seventh Circuit order in *Oral Sekendur v. Dent-A-Med,* Nos. 03-3854, 03-4134, 04-4274, 05-2000 (7th Cir. Dec. 27, 2005), on appeal from case no. 00-C-7054 (N.D. Ill.), requiring him to pay $2,500 to the Seventh Circuit Clerk's Office before this court may accept filings from him in all matters except criminal cases and habeas corpus relief.  As a result of this bar, Oral Sekendur has not paid the Seventh Circuit fine and has not pursued the two counterclaims he previously filed against McCandliss, alleging abuse of process and intentional infliction of emotional distress.  (Dkt. No. 36.)  Because Oral Sekendur presented no evidence on these counterclaims, the court orders entry of judgment against Oral and in favor of McCandliss on Oral's counterclaims.

considering the arguments of counsel, the court grants judgment in favor of McCandliss and against Batur on McCandliss's claim that Batur filed false claims for disability benefits and that Oral conspired with him.

BACKGROUND

In determining the case, the court finds the following facts. The court adopts each of the parties' stipulated facts stated in the Final Pretrial Order. Among those stipulated facts, the parties agree that Batur has claimed impairment from a medical condition since at least 1989. (Pretrial Ord. § K ¶ 1.) Batur has also claimed disability on private policies of insurance and received benefits from those policies. (Id. at ¶ 2.)

A.    Batur's Application for Social Security Benefits

On February 20, 1992, Batur filed what appears to be a second "Disability Report" for Title II disability benefits with the SSA ("1992 Disability Report"), asserting disability since May 7, 1991 based on the stated symptoms of "chronic neck sprain, fibromyositis, depression, migraine, headaches, allergies, chronic fatigue."[2] (Pl. Ex. 27 at 1; Pretrial Ord. § K ¶ 3.) In the 1992 Disability Report, Batur claimed that he had practiced dentistry before the onset of his disability "until [his] condition worsened" and he "could not perform any work in [his] office." (Id. at 1.) Batur stated in the 1992 Disability Report that his symptoms were now "just about constant" and he also complained of memory loss, loss of concentration, and an inability to make decisions. (Id. at 1, 6.) Batur signed and dated the 1992 Disability Report under language in the

_____

[2]Batur called Dr. Guy Anthony Rowley, to testify at the trial. Dr. Rowley, after examining Batur's array of medical records, opined in his previous affidavit (Def. Ex. A) and at the trial that Batur suffers from fibromyalgia. Dr. Rowley examined Batur before the trial but did not offer an opinion based upon that pretrial examination of Batur. Batur refers to his condition throughout the proceedings as "fibromyalgia."

form that stated as follows:

> Knowing that anyone making a false statement or representation of a material fact for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal law, I certify that the above statements are true.

(*Id.* at 6.)  In the section of the 1992 Disability Report regarding treatment and medical records, Batur described a long medical history of treatment.  Batur identified by name two doctors that he had seen for treatment, Dr. Dietrich K. Klinghardt and Dr. Michael D. Yablouski.  Batur also stated in the 1992 Disability Report that a list of other doctors and reports could be obtained from Dr. Yablouski but were "too many to list" on the 1992 Disability Report.  (Pl. Ex. 27 at 2.)  Batur also attached business cards for an allergist and physical therapist.  (*Id.* at 3.)  Batur asserted that his treatments included trigger point injections for pain, intravenous treatments of Vitamin C, sensitivity testing for allergies, anti-depressants, anti-inflammatory medications, physical therapy, and referrals to a neurologist, orthopedic surgeon, psychiatrist, and allergist.  (*Id.* at 2.)

After Batur's 1992 application for benefits was denied, (Pl. Ex. 28), Batur submitted to the SSA a Reconsideration Disability Report ("1992 Reconsideration Report") on August 2, 1992.  (Pl. Ex. 29.)  In the 1992 Reconsideration Report, Batur contended that his symptoms had worsened.  He claimed that the pain in his neck and his headaches were "almost constant" and required "constant medication."  He also asserted that his fatigue and depression had become severe.  (*Id.* at 1.)  As a result, Batur stated that he had "trouble doing almost anything."  (*Id.* at 1.)  With regard to the effect on his daily activities, Batur explained in the 1992 Reconsideration Report that he does less driving, can no longer study, reads very little, and stopped doing all work around the house.  (*Id.* at 3.)  Batur certified with his signature that the statements in the

1992 Reconsideration Report were true.  (*Id.* at 4.)

Batur next filed a form entitled "Claimant's Statement When Request for Hearing is Filed and the Issue is Disability," ("1993 Statement"), which he signed and dated "February 29, 1993."[3]  (Pl. Ex. 43.)  In the 1993 Statement, Batur stated that the pain and frequency of the migraines had increased and required constant medication.  (*Id.* at 1.)  Batur listed his prescribed medications as 30 mg of Vicoden, 700 mg of Soma, 20 mg of Flexeril, 60 mg of Seldane, 20 mg of Prozac, in addition to "certain Chinese Pain Medications."  (*Id.* at 2.)  Batur also explained that the headaches and pain are unpredictable "which makes it very hard to do anything with regularity."  (*Id.* at 1.)  Batur certified to the truth of the 1993 Statement with his signature and date.  (*Id.* at 2.)

Although there again is no document in the trial record evidencing the SSA's denial of Batur's claim for disability, the court infers that Batur's claim was denied based on a Batur's submission of a form received by the SSA on March 8, 1993 requesting a hearing before an Administrative Law Judge ("ALJ"), ("1993 Request").  (Pl. Ex. 46.)  In the 1993 Request, Batur stated that he disagreed with the determination the SSA had made with regard to his 1992 Reconsideration Request because "[t]he conclusion that my pain and depression is occasional and controled [sic] by medication is grossly inaccurate.  If medication was effective my condition would not be getting progressively worse."  (*Id.* at 1.)

A hearing before ALJ Richard J. Murphy was held on May 19, 1994.  Batur and his brother Oral both testified at the hearing.  In a written decision dated October 26, 1994, the ALJ granted Batur's claim for disability.  (Pl. Ex. 55.)  The ALJ's written decision summarized

---

[3]The court notes that the date "February 29, 1993," of course, never existed.

Oral's testimony in one sentence: "[Batur's] brother testified at the hearing that the claimant's mental and physical condition has greatly diminished because of unrelenting pain." (*Id*. at 2.) The ALJ found Batur's impairments of somatoform disorder, cervical sprain syndrome, migraine headaches, chronic fatigue, and neck and muscle pain to be severe. (*Id*. at 3.) The ALJ further found that Batur's impairments met the listed impairment for somatoform disorders, *see* 20 C.F.R. Pt. 404, App. 1 to Sbpt. P § 12.07 (defining somatoform disorders as "Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms."). (*Id.*) The ALJ determined that Batur had been disabled under the Social Security Act since May 7, 1991 and awarded Batur disability benefits. (*Id*.) Batur began receiving SSA Title II benefits starting on December 13, 1994, retroactive to May 7, 1991. Batur elected on August 12, 1999 to continue to receive benefits, and he continues to receive benefits at this time. (Pl. Ex. 87a; Pretrial Ord. § K ¶ 4.)

B.      Federal Aviation Administration ("FAA") Certificates and Illinois Dental License

During the same time period in the early 1990s of the alleged onset of Batur's disability and his submissions to the SSA to obtain disability benefits, Batur applied to the FAA for his First Class Medical Certification for his Student Pilot Certificate on October 17, 1991 ("1991 FAA Certificate Application") and later his Third Class Medical Certification on December 27, 1993 ("1993 FAA Certificate Application") by filling out with each application the FAA Form 8500-9. (Pl. Exs. 23 & 49.) Batur with his signature on both the 1991 and the 1993 FAA Certificate Applications certified that "all statements and answers provided by me on this application are complete and true to the best of my knowledge" under penalty of 18 U.S.C. §§ 1001; 3571. (Pl. Exs. 23 & 49.) In both FAA Certificate Applications, Batur stated that he did

not "ever" have and did not "have now" any of the impairments or conditions listed on the form. Among the conditions listed on the form were "Frequent or severe headaches"; "Hay fever or allergy"; "Mental disorders of any sort: depression, anxiety, etc."; "Admission to hospital"; or "Other illness, disability, or surgery." (Pl. Exs. 23 & 49.) Batur also checked the box on the form that he did not currently use any prescription or nonprescription medication. (Pl. Exs. 23 & 49.) In addition, despite stating on his 1993 FAA Certificate Application that he was "retired," (Pl. Ex. 49), Batur admitted at the bench trial that he was not retired at that time but was on disability.

To obtain approval of his FAA Certificate Applications, Batur had to undergo a physical examination in both 1991 and 1993. In 1991, the FAA examiner was Dr. Surendra P. Goel. In 1993, the FAA examiner was Dr. Walter J. Levy. Both doctors found Batur to have no disabling condition based on their respective examinations and review of the medical history supplied by Batur. (Pl. Ex. 118.) At the trial, Dr. Goel testified that he conducted a physical examination of Batur and reviewed the 1991 FAA Certificate Application provided by Batur. The physical exam consisted of examining the head, neck, nose, sinuses, ears, heart, chest and other aspects of the body. Dr. Goel as part of his regular examination procedure would move the neck of the person he was examining to see if there was any stiffness and would test trigger points. In performing this examination on Batur, Dr. Goel found no evidence of disease, all-over body pain, or debilitating headaches or tension.

Dr. Levy, in testifying at the trial about his 1993 physical examination of Batur, stated that there was nothing that he found during his physical examination of Batur that led him to believe that Batur had any conditions that would prevent the issuance of the FAA flight

certificate for which Batur had applied. Dr. Levy further testified that certain conditions and medications require either denial of an FAA flight certificate or a referral for further investigation to determine if the conditions or medications could impair an applicant's ability to function safely as a pilot. Dr. Levy testified that if an applicant has migraine headaches or depression, these are conditions requiring referral for further investigation. With regard to medications, Dr. Levy testified that Prozac and the muscle relaxer class of medications would lead Dr. Levy to refer the case for further investigation. Dr. Levy confirmed that had he, Dr. Levy, been aware of any of the conditions that Batur claimed as impairments to the SSA or of certain of the medications that Batur claimed to the SSA that he, Batur, was taking, Dr. Levy would not have authorized issuance of the FAA flight certificate to Batur. Dr. Levy testified at the trial that he found nothing to suggest that Batur suffered from any of the conditions or took any medication Batur had claimed to the SSA. According to Dr. Levy, Batur appeared to be completely healthy. In addition to not disclosing on his 1991 FAA Certificate Application his purported ailments and all the medications he was taking, Batur did not disclose any visits to any physicians when he was asked on the form whether he had visited a health professional in the last three years. On his 1993 FAA Certificate Application, Batur only disclosed his visit to Dr. Goel for his FAA physical in 1991. (Pl. Exs. 23 & 49.)

At the trial, Dr. Mark Richter, an Aviation Medical Examiner and medical doctor, testified to his opinion of Batur's physical and mental impairments based on his review of the medical records from Dr. Goel and Dr. Levy, the FAA Certificate Applications submitted by Batur, and some of the submissions provided by Batur to the SSA. After reviewing these records, Dr. Richter concluded at the trial that Batur could not have suffered from the ailments

that he claimed to the SSA to be disabling. Dr. Richter's determination was based upon the lack of physical or mental symptoms presented by Batur at his physical examinations with Dr. Goel and Dr. Levy, the training received by Aviation Medical Examiners such as Dr. Goel and Dr. Levy so that they can discover any viable symptoms or conditions that would require a report to the FAA, Batur's inconsistent set of medical treatments and the subjective nature of all of Batur's symptoms. Specifically with regard to Batur's medical treatment plan, Dr. Richter noted that there would normally be more documentation of the evaluation of the treatments prescribed to Batur and the determinations made regarding those prescribed treatments by the doctor. According to Dr. Richter, it is impossible for Batur's statements to the SSA to be true in light of Batur's medical certifications to the FAA, and the contradictory, varied, and subjective claims made by Batur to the SSA.

The FAA also asked Batur on each of his FAA Certificate Applications about the amount of hours he had flown. Batur attested on the 1991 FAA Certificate Application that he had logged 20 hours of pilot time total, all of which were within 6 months of his October 17, 1991 application to the FAA. (Pl. Ex. 49.) By his 1993 FAA Certificate Application, Batur stated that he had logged an additional 40 hours, bringing his total pilot time to 60 hours, with 1.5 hours occurring in the prior six months to December 1993. (Pl. Ex. 23.) At the trial, Batur clarified that some of those 60 hours of flight time involved long cross country flights with an instructor, solo flights, and night flying. Dean Greenblatt, an FAA flight instructor and attorney who testified at the trial, explained that solo flights and night flying are considered advanced skills.

Batur claimed at trial that he stopped flying planes when his impairment worsened. Although Batur had flown 60 hours during 1991 to 1993, Batur did not list flying airplanes as an

activity in which he participated in his 1992 Disability Report to the SSA (Pl. Ex. 27) under the

section asking specifically about the claimant's activities.  Batur also did not list flying airplanes

in any of his later filings with the SSA, such as his 1992 Reconsideration Request (Pl. Ex. 29),

which asked Batur for information about any change to his daily activities.  (*Id*. at 3.)

Batur also submitted an application on December 10, 1992 to the Illinois Department of

Professional Regulation ("IDPR") to renew his license to practice dentistry in Illinois ("1992

IDPR Application").  (Pl. Ex. 40.)  In the 1992 IDPR Application, Batur stated under penalty of

perjury that he did not have any disease or condition that would interfere with his ability to

practice dentistry.[4]  (Pl. Ex. 40.)  At the bench trial, Batur claimed that this statement to the

IDPR was a lie.

C.      Batur's Work and Physical Activity After He Began Receiving Disability Benefits

According to Batur, he moved to Illinois from New Jersey around 1992 or 1993 and

submitted the 1992 IDPR Application, planning to work with his brother Oral in the denture

business until the onset of his disability forced him to give up dentistry.  In September 1994,

while Batur's claim for disability was near to being granted, Batur's brother Oral opened One

Visit Dental Center, in Chicago, Illinois, which offered patients crowns and inexpensive,

quickly-made dentures, using Batur's dental license and listing Batur as the owner.  (Pl. Exs. 84,

93.)  The IDPR in May 1998 brought charges against Oral for practicing dentistry without a

license and against Batur for aiding and abetting Oral by permitting Oral to use his name and

license for One Visit Dental.  (Pl. Ex. 87 at 1.)  The IDPR later added a charge against Batur,

---

[4]Batur additionally signed on September 3, 1996 and again on June 21, 2000, his New Jersey Driver's License and motorcycle endorsement renewal application, certifying that he does not suffer from any mental, physical, or convulsive disorder (Pl. Exs. 75, 91).

alleging that Batur had a physical illness and/or disability which resulted in his inability to practice dentistry with reasonable judgment, skill or safety. (*Id.* at 2.) The IDPR eventually settled with Batur in June 1999. (Pl. Ex. 87.) The IDPR suspended Batur's Illinois dental license for a minimum period of 4 months with its restoration dependent on a showing by clear and convincing evidence that he was physically and mentally competent to practice dentistry. (Pl. Ex. 87 at 5-6.) Despite Batur's admission in the 1999 settlement agreement with the IDPR that he had a disability preventing him from practicing dentistry with reasonable judgment, skill or safety, Batur stated that "in the past year [June 1998-June 1999], since he has been taking the new medication Zomig, . . . his physical condition has substantially improved." (Pl. Ex. 87 at 3.) Batur did not inform the SSA that his physical condition had "substantially improved" in June 1998 to June 1999. In fact, two months later in August 1999, Batur elected to continue his Title II benefits, and in January 2000, Batur wrote a letter to the SSA, alerting the SSA that his condition had become "worse at an alarming rate." (Pl. Exs. 87a; 89.)

Batur admits to working occasionally since being awarded disability benefits in 1994. At the trial, Batur testified that he performed dentistry on a couple of occasions in Chicago. Batur testified that in 1993 he assisted his brother, Oral, for a period of time in Chicago performing clinical trials of the denture process that Oral was planning to utilize at the soon-to-opened One Visit Dental. In his answers to the plaintiff's interrogatories, Batur also stated that he helped Oral in 1994 about once a week for a total of six months with the practice by treating several patients and giving Oral advice about dental office procedures and supplies. (Pl. Ex. 94.) At the bench trial, however, Batur, denied this 1994 assistance with patients. Batur then moved from Chicago. Following that period, Batur provided dental services to patients at One Visit Dental

on approximately two occasions when he was visiting. On occasion, Batur would deposit his disability checks from the SSA in the checking account for One Visit Dental, for which he was a signatory, and write a check to himself in the exact amount of the deposited disability checks. (Pl. Ex. 74.)

Additionally, Batur worked as a office manager in Florida with a Dr. Paul Cavalluzzo in 1996 and 1997, with a Dr. Ashok Lalli of Washington for 4.5 days in 2005 as an independent contractor, and with a Dr. Hilal Ahmad of Washington for three days a week as an independent contractor in February 2006. (Pl. Ex. 96; Def. Ex. B at paginated 25.) Batur also worked a total of 5.5 days as a independent contractor in 2004. In July 2006, Batur planned to open his own office, but it is not clear from the record whether he has succeeded. (Pl. Ex. 95 at 6.)

From the trial record, it appears that Batur updated the SSA on three or four occasions with regard to his disability and some of his employment experiences: in his April 18, 1998 "Report of Continuing Disability Interview," (Def. Ex. B, "SSA Report of Continuing Disability Interview" from May 4, 1998 (herein after "May 4, 1998 SSA Report")), in 2001 in response to an SSA investigation regarding Oral's use of Batur's dental license (Pl. Ex. 93), in 2005 in an undocumented conversation with an SSA agent, and in a letter to the Seattle Division of Disability dated May 6, 2006 (Pl. Ex. 96).

Turning first to Batur's 1998 Report to the SSA, Batur asserted that his "condition has gotten worse," and stated that he had been hospitalized and had undergone neck surgery. (Def. Ex. B, May 4, 1998 SSA Report at 3, 5.) Batur also stated that the medications he took had changed since the 1992 Application and in 1998 consisted of: "Percocet, Oxycontin, Valium, Neurontin, and Zomig"—the medication he had credited a year later with improving his physical

condition in the 1999 settlement agreement (Pl. Ex. 87) with the IDPR.  (Def. Ex. B, May 4,

1998 SSA Report at 9.)  Batur also stated that he had "tried several times to return to work in my

own profession (Dentistry) but could not due to pain, lack of concentration, and memory loss."

(*Id.* at 8.)  Batur provided the SSA his attempts to work, identifying his job as the office manager

from Dr. Cavalluzzo in 1996 and 1997, and the several occasions in which he tried to work as a

dentist during 1992 to 1995.  (*Id*. at 7.)  Batur did not include any other descriptive information

such as location regarding his work as a dentist during the 1992-1995 period, however, the trial

record indicates that this time period coincides with the time period that he worked at One Visit

Dental in Chicago.  (*Id*.)  The court also notes that Batur did not inform the SSA of any work

that he did for Delta Dental Plan, which according to trial testimony, paid Batur $847 for

nonemployee compensation for the 1997 tax year and considered Batur to be a Delta Dental Plan

provider in 1998.[5]  (Pl. Ex. 109, 110.)  After reviewing Batur's May 4, 1998 SSA Report, the

SSA found his disability to be continuing and his limited work from 1996 to 1997 not to exceed

the allowed trial work period under 20 C.F.R. § 404.1574.  (*Id.* at 1.)

The SSA next contacted Batur in November 2001, after receiving a report that Batur was

running a dental office in Chicago with his brother.  (Pl. Ex. 93.)  In response to the SSA agent's

questions about whether Batur had worked since he had been on disability, Batur stated that he

had worked for a dentist in Gainesville Florida in 1996 and 1997.  (*Id*.)  The SSA agent noted

---

[5]Plaintiff has submitted a 1997 IRS Form 1099-Misc in Batur's name but with an incorrect social security number, indicating that Delta Dental Plan of Illinois paid Batur $847 in nonemployee compensation.  (Pl. Ex. 109.)  Plaintiff elicited testimony from Terri Bon, records custodian at Delta Dental Plan, that Delta Dental Plan would not be the likely source for the incorrect social security number because Delta Dental Plan takes the taxpayer number provided by the payee.

that this work activity had been documented in Batur's file.  (*Id.*)  When the SSA agent asked

whether he had performed any other work, Batur responded "no."  (*Id.*)  The SSA agent

specifically asked if Batur had ever worked in Chicago and Batur stated that he had not worked

in Chicago, but his brother had used Batur's dental license to open a dental business illegally.

(*Id.*)  The SSA agent concluded without further investigation that there was no concealed work

activity and thus no overpayment issue.  (*Id.*)

On May 6, 2006, while this litigation was pending, Batur sent a letter to the SSA in

Seattle, ("2006 Letter") (Pl. Ex. 96), informing the SSA that his condition had recently improved

and attaching an undated "Work Activity Report" with no stamped date of receipt by the SSA.

(Pl. Ex. 95.)  Batur explained that he had tried to contact the Social Security Office "numerous

times by phone but have been unable to reach anyone" and that he left several messages without

response.  (Pl. Ex. 96.)  Batur asked that the SSA look into the "discontinuation of my payments

and the return of any overpayment (if any)."  (*Id.*)  In the 2006 Letter, Batur told the SSA that his

"health has improved due to a new medication (Cymbalta), which I have been taking for about a

year now."  (*Id.*)  Batur in 2006 letter also asserts that he talked to a SSA agent in 2005, gave her

copies of several paychecks, and informed her of his intent to return to work more regularly.

(*Id.*)  There, however, is no other evidence in the record regarding this purported 2005 contact

with the SSA asserted by Batur.  In the undated "Work Activity Sheet," which appears to have

been attached to the 2006 Letter, Batur informed the SSA about the 5.5 days he worked in 2004,

the 4.5 days he worked for Dr. Lalli in 2005, and his contract job with Dr. Ahmad in 2006.  (Pl.

Ex. 95 at 3-6.)  Even though the SSA calculates earnings from employment based on gross

income, *see* 20 C.F.R. § 404.1574(b)(1), Batur did not provide his income for 2005 and 2006 in

the Work Activity Report, stating that he did "not anticipate any net income for 2005 or 2006 and may even have a loss." (*Id*. at 7.)

In addition to his work, Batur has engaged in rigorous physical activities on what appears to be numerous occasions since he began receiving SSA Title II benefits, though he claims to have only engaged in physical activity when he was feeling well. The parties agree that between May 7, 1991 and August 22, 2002, Batur has participated in such physical activities as downhill snow skiing, horseback riding, rollerblading, whitewater rafting, sailing, and motorcycling. (Pretrial Ord. § K ¶ 6.) Batur also testified at the bench trial to motorboating. Batur's engaging in these strenuous activities does not comport with Batur's claims of disability and is inconsistent with Dr. Rowley's testimony that, although pain associated with fibromyalgia waxes and wanes, exercise by individuals with fibromyalgia usually should be low impact. Downhill snow skiing, horseback riding, and whitewater rafting are not activities that could be considered "low impact" on a participant's neck and back.

With regard to Batur's motorcycling, Batur at the trial testified that he owned several motorcycles over his adult life and rode motorcycles throughout the entire period of his purported disability. Yet, in his reports to the SSA about his daily activities, Batur stated that he was driving less and less, and on March 15, 2000, Batur informed the SSA in his "Activities of Daily Living Questionnaire" that he was "considering not driving at all due to a recent accident and loss of my skills." (Pl. Ex. 119.) On October 4, 2004, Seattle Police Department Sergeant Doug Vandergiessen ("Sergeant Vandergiessen") issued a ticket to Batur for his operation of a motorcycle at excessive speeds. (Pl. Ex. 107.) Sergeant Vandergiessen testified at trial that he observed Batur's motorcycle riding and that Batur was skilled at operating a large motorcycle.

Sergeant Vandergiessen also noted that the Panzer Motorcycle driven by Batur and the class of motorcycle license that Batur had procured would require an individual to be able to skillfully control and maneuver a heavy motorcycle vehicle.  (Pl. Ex. 107.)  The activity, which Batur admitted at the trial that he engaged in throughout the entire time of his purported disability, appears to be inconsistent with the pain and disabled physical condition Batur claimed to the SSA he was suffering as well as the loss of driving ability that he claimed to the SSA to have experienced.

D.      Batur Sekendur's Credibility

        The court, as factfinder, assesses Batur's credibility, based on both documentary evidence in the record and his testimony during the bench trial.  The court finds Batur to be not credible.  Batur, during his testimony, frequently answered questions posed by counsel with an assertion of memory failure, explaining that his impairment had caused him to take many prescription medications that affected both his memory and ability to concentrate during the relevant period of claimed disability.  Additionally, his friend from dental school, Dr. Donald Perry, testified to observing in his interactions with Batur that Batur was in pain around the time of 1993.  Yet, in October 1991 and December 1993—while claiming a disabling impairment requiring Batur to take a variety of medications that allegedly produced these symptoms of memory loss and inability to concentrate—Batur was able to pass two FAA physical examinations by Dr. Goel and Dr. Levy, who were trained Aviation Medical Examiners, without raising any concerns regarding his physical or mental health.

        The court further highlights aspects of Batur's testimony that support the court's finding that Batur is not credible.  Initially, while on the witness stand during the trial on the afternoon

of February 13, 2007, Batur testified that he did not think he had told the SSA about his piloting of airplanes. After Batur heard the trial testimony of attorney Frank Tuzzolino, who had represented Batur during the 1994 ALJ hearing, that Batur had told Tuzzolino about flying, Batur, when recalled to the witness stand on February 14, 2007, testified that he *had* told the SSA about his piloting of airplanes. When Batur was pressed about his recollection of this alleged disclosure to the SSA, Batur admitted that he was only testifying that he told the SSA about his flying activities because he had just heard Tuzzolino's testimony that Batur and Tuzzolino had had a conversation about Batur's flying. Batur then admitted at the trial that he did not personally recall the conversation, and again admitted that he did not believe he had informed the SSA (as opposed to Tuzzolino) about his piloting of airplanes.

Batur also testified that he did not disclose his alleged impairments to the FAA because he did not want to bother gathering the medical records that he thought the FAA would then require. Batur testified at the trial that he believed himself capable of flying airplanes. The court finds that for Batur to believe himself to be capable of flying airplanes during the period that he claimed disability would suggest that Batur was also capable of working. The court also finds that Batur's ability to fly airplanes, which was not disclosed to the SSA, was material and relevant to the SSA's determination of Title II disability.

Finally, the court finds Batur's testimony of his physical activities, specifically, Batur's recounting that a doctor prescribed "low impact" downhill snow skiing for Batur's purported fibromyalgia and Batur's equating during his testimony the impact of motorboating with driving an automobile to be suspect. The threatened impact of a fall while downhill snow skiing or the bumping and jarring of a motorboat crossing even small waves would be something that a person

experiencing the pain Batur describes would greatly desire to avoid. The court cannot say that Batur suffers or suffered no level of physical pain at all. But, based on his testimony, the testimony of other witnesses, and the documentary evidence, the court finds that Batur—even under oath and penalty of perjury—exaggerated his alleged pain and physical condition to the level of an impairment for the purposes of benefitting himself and has done so for years.

E.     Procedural History

Relator McCandliss, an attorney whom Batur had originally hired to sue his private disability insurer and whom Batur later sued for malpractice, filed this qui tam lawsuit against Batur and Oral in August 2002 under the FCA. The government declined to pursue the lawsuit, and so McCandliss has continued prosecuting the case on his own. The court denied the parties' cross-motions for summary judgment on September 12, 2006, and the case has proceeded to the now-concluded bench trial.

<u>LEGAL STANDARD</u>

To prove liability under the FCA, the plaintiff must establish that the defendant knowingly made, used, or caused to be made or used a false or fraudulent record or statement in order to get the government to pay money on a false or fraudulent claim. 31 U.S.C. § 3729(a); *see United States ex. rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005); *United States ex. rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999). The mens rea of "knowingly" requires only that the defendant have "actual knowledge of (or deliberately ignore or act in reckless disregard of) the truth or falsity of information presented," not that the defendant have "specific intent to defraud." *United States ex. rel. Durcholz v. FKW, Inc.,* 189 F.3d 542, 544 (7th Cir. 1999). Innocent mistakes or negligence, however, are not

actionable.  *Lamers*, 168 F.3d at 1018 (quoting *Hindo v. University of Health Servs.*, 65 F.3d 608, 613 (7th Cir. 1995)).  The FCA also applies to conspiracies to defraud the government by "getting a false or fraudulent claim allowed or paid."  31 U.S.C. § 3729(a)(3).

ANALYSIS

The central issue to be resolved in this case is whether Batur knowingly submitted false statements in his claim to the SSA for disability benefits, leading to the award of benefits to Batur in 1994.  Comparing the inconsistencies regarding his physical condition stated on the documents in evidence including Batur's 1992 Disability Report to the SSA and his two FAA Certificate Applications in 1991 and 1993 along with his 1992 IDPR Application, Batur either lied or provided false or fraudulent information to the SSA in violation of the FCA or Batur lied or provided false or fraudulent information to the FAA and the IDPR.  Whether the false or fraudulent information was provided to the SSA to receive benefits or provided to the FAA and the IDPR is a crucial distinction under the FCA.  Of the three federal and state agencies, only the SSA paid out money to Batur, and therefore, Batur is liable under the FCA only if he provided or caused to be provided the false or fraudulent information to the SSA, and he did so knowingly.  *See Gross*, 415 F.3d at 604 (under the FCA "the fraudulent statement's purpose must be to coax a payment of money from the government").

After considering the testimony and other evidence presented at the trial, the court finds that Batur knowingly made, used, or caused to be made or used a false or fraudulent record or statement in order to get benefits from the SSA on a false or fraudulent claim in violation of the FCA.  In finding that Batur violated the FCA, the court does not say that Batur had no ailment because the ailments of which Batur complains have primarily subjective symptoms and are

typically without objective physical evidence. Rather, the court finds based upon all the evidence that Batur knowingly provided false and fraudulent information about the debilitating nature of his ailments to obtain benefits for a purported impairment that did not exist to the degree Batur claimed and that, without his false and fraudulent information and if Batur had made an honest and full disclosure to the SSA, Batur would not have established a sufficiently severe impairment to lead the SSA to award him Title II benefits.

As mentioned earlier, the impairment for which the SSA awarded Batur disability benefits, somatoform, is by definition a disorder for which there are only subjective symptoms with no demonstrable organic findings or known physiological mechanisms, as is Batur's later claimed diagnosis of fibromyalgia. If Batur were not to disclose his subjective symptoms to an examining doctor, the doctor would not be able to diagnose his claimed disorder using objective medical diagnostic testing. The court finds that Batur took advantage of the subjective nature of the medical diagnosis for this ailment and the absence of the ailment's objective symptoms, at the very least, to fraudulently exaggerate the ailment's severity and his incapacity resulting from it.

The testimony of Drs. Richter, Levy, and Goel supports the court's finding of fraud by Batur. The court finds that the Aviation Medical Examiners, Drs. Goel and Levy, who physically examined Batur were trained to discover impairments, such as headaches, depression, and neurological problems, and the ingestion of medications, such as pain medications, soma, or muscle relaxers, that could lead potentially dangerous circumstances while the individual they were examining was flying. Dr. Levy and Dr. Goel determined Batur to be without any disease or impairment, and Dr. Richter, in his review of their records and records submitted by Batur to

the SSA, lead this court to conclude that Batur had defrauded the SSA.  This testimony by these medical doctors coupled with the exhibits in evidence and Batur's lack of credibility establishes by clear and convincing evidence that Batur knowingly and intentionally defrauded the SSA.

The court's finding that Batur knowingly and intentionally defrauded the SSA is also based on the activities that Batur pursued since the time he was determined by the ALJ to have been disabled beginning on May 7, 1991.  Despite Batur's claims of disability resulting in his receiving SSA Title II benefits, Batur successfully piloted airplanes for a total of 60 hours from 1991 to 1993.  Although Batur argues that his disability caused him to stop flying, the court finds that Batur's failure to disclose his flying activities to the SSA is evidence that Batur knew that he was not deserving of SSA benefits and that he believed he would not receive benefits if the SSA were informed of Batur's flying activities.  The court finds that Batur's failure to disclose his airplane flying to the SSA while he simultaneously sought disability benefits is further evidence that he knowingly and intentionally provided the SSA with false information about his capabilities.

Batur also failed to inform the SSA of his continued participation in the physically tasking and rigorous recreational activities of downhill snow skiing, horseback riding, rollerblading, whitewater rafting, sailing, motorboating and motorcycling during time period of May 7, 1991 to August 22, 2002.  The court finds Batur's statement to the SSA that he could no longer engage in these activities, when he in fact continued to participate in these activities, to be further evidence that Batur believed the SSA would not award him Title II benefits If the SSA had full knowledge of his physical capabilities.  Even accepting Batur's claim that his doctor recommended that he exercise and that he engaged in the stipulated recreational activities only

when he was feeling sufficiently well, Batur's withholding information from the SSA of his ability to engage in these activities is further clear and convincing evidence demonstrating Batur's intent to deceive the SSA. In sum, Batur's knowingly and intentionally withholding of material information about his physical capabilities in light of his claim that his doctor recommended physical activity as treatment supports the court's finding that Batur purposefully did not disclose the information to the SSA out of a belief that if the SSA knew about his physical capabilities, the SSA would deny him the SSA benefits he received.

The court also finds that Batur concealed from the SSA his employment activity and his income subsequent to his award of disability benefits in 1994. Although Batur provided the SSA with some information of his work activities, evidence in the record supports of a finding that Batur worked more than what he reported to the SSA. First, the court finds that Batur worked at One Visit Dental more often than was disclosed to the SSA, specifically during 1993 when he assisted Oral in clinical tests of the denture process. Batur's failure to inform the SSA of his work at One Visit Dental was knowingly false.

Additionally, the evidence regarding Delta Dental Plan's payment of $847 to Batur supports the court's finding that Batur did not report to the SSA the extent that he was working while receiving disability benefits. Although Batur denies ever working for Delta Dental Plan and receiving compensation from the company, the finds that Batur in fact worked for Delta Dental Plan and received compensation from them based on an IRS Form 1099-misc from Payer Delta Dental Plan to Recipient Batur Sekendur for nonemployee compensation of $847 and Delta Dental Plan's "Combined Tax Statement for Year 1998" reporting payment of taxes for Batur Sekendur's services. (Pl. Exs. 109, 110.) Based on the inconsistencies between Batur's

actions and the statements that Batur submitted to the SSA, and the court's finding that Batur knowingly and intentionally provided false information to the SSA, the court concludes that Batur violated the FCA to receive disability benefits.

The court also again rejects Batur's argument—previously raised in his motion for summary judgment and renewed in his motion for judgment as a matter of law at the close of the plaintiff's case—that collateral estoppel bars the court from deciding the merits of the False Claims Act claim that Batur provided fraudulent or false information to the SSA to obtain Title II benefits. Specifically, Batur argues that collateral estoppel precludes any reconsideration or review by this court of the ALJ's 1994 decision awarding benefits to Batur. As this court previously concluded in its September 12, 2006 summary judgment opinion, Batur's argument ignores 20 C.F.R. § 404.988, which allows a decision by the SSA to be reopened at any time if it was obtained by fraud or similar fault. The court also reiterates its reasoning that acceptance of Batur's argument on this point would lead to the absurd circumstance of preventing the government from prosecuting cases against individuals who have fraudulently received SSA disability benefits once such benefits have been awarded.

Having found that Batur's SSA benefits were fraudulently obtained, the court turns to assess defaulting defendant Oral Sekendur's role in the defrauding of the SSA. Oral, by failing to pay the sanction owed to the Seventh Circuit, as described in footnote one of this opinion, has not filed any papers on his behalf in this case since the imposition of that sanction by the Seventh Circuit on December 27, 2005. The court has found that Oral is in default on plaintiff's claim that he conspired with Batur to defraud the SSA. The court still, however, must address the evidence in the record to determine whether a default judgment should be entered against Oral.

In doing so, the court finds clear and convincing evidence in the record to determine that Oral Sekendur conspired along with Batur to provide the SSA with false and fraudulent information so that Batur would receive Title II benefits from the SSA. At Batur's SSA hearing in 1994 that led to the awarding of benefits to Batur, Oral testified under oath that Batur's mental and physical condition had greatly diminished due to "unrelenting pain." (Pl. Ex. 55 at 2.) The court determines from the facts presented at the trial that Oral knowingly and intentionally provided false information to the SSA about Batur's condition despite knowing that Batur was well enough to work at a dental practice, at least during 1993. Based in part on both Oral and Batur's testimony to the ALJ at the SSA hearing in 1994, the ALJ awarded disability benefits to Batur. The court finds that Oral's actions and all the factual circumstances shown by the evidence presented at the trial establish a conspiracy between Batur and Oral to falsely obtain benefits from the SSA. *See* 31 U.S.C. § 3729(a)(3). The court enters a default judgment against Oral for conspiracy to defraud the SSA in violation of the FCA.

CONCLUSION

Following the bench trial on liability, the court finds in favor of plaintiff McCandliss on his False Claims Act claim against defendant Batur Sekendur. The court also directs the entry of a finding of liability for plaintiff McCandliss and against Oral Sekendur on the False Claims Act claim of conspiracy by default. Oral Sekendur's two counterclaims (Dkt. No. 36) are dismissed with prejudice for failure of evidence. A finding on the issue of liability is entered in favor on McCandliss and against Batur and Oral Sekendur on all counts and counterclaims, and, pursuant to Federal Rule of Civil Procedure 54(a), there is no just reason for delaying judgment being entered in plaintiff's favor and against defendant Oral Sekendur on both of Oral Sekendur's

counterclaims.  The court therefore directs entry of judgment against defendant Oral Sekendur

on the pending counterclaims.  This case is set for status on March 15, 2007 at 9:00 a.m. to enter

a schedule to resolve the remaining issues including the determination of damages that are to be

tried on plaintiff's claims against defendants Batur and Oral Sekendur.  The parties are again

encouraged to discuss settlement.

ENTER:


*James F. Holderman*
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: February 20, 2007